J-S40040-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MARCUS R. JOHNSON | : | |
| | : | |
| Appellant | : | No. 2964 EDA 2019 |

Appeal from the PCRA Order Entered September 20, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0014428-2014

BEFORE:   SHOGAN, J., KING, J., and COLINS, J.*

MEMORANDUM BY COLINS, J.:                    **FILED OCTOBER 6, 2020**

Appellant, Marcus R. Johnson, appeals from the order entered September 20, 2019, that dismissed his first petition filed under the Post Conviction Relief Act ("PCRA")[1] without a hearing.  We affirm.

The facts underlying this appeal are as follows:

> During the summer of 2014, [Appellant] lived at 987 South 5th Street in the City and County of Philadelphia with his longtime paramour, the decedent Nekeisha Eugene, and their nine-year-old son, [M.J.]  Although [Appellant] and the decedent were romantically involved for the preceding seventeen years, [Appellant] had numerous affairs between 2011 and August 2014.
>
> In 2011, after the decedent discovered that [Appellant] had an affair during a trip to Las Vegas, she moved out of the

---

* Retired Senior Judge assigned to the Superior Court.

[1] 42 Pa.C.S. §§ 9541–9546.

house for two weeks. Subsequently, [Appellant], a manager of a Walmart, cheated on the decedent with several fellow Walmart employees. In mid-August 2014, the decedent discovered some of these affairs and confronted [Appellant], resulting in numerous arguments. [N.T., 6/24/2016, at 41-44, 108, 152 (Appellant's testimony).[2]]

On September 4, 2014, [Appellant] celebrated his birthday and, despite his promises to remain faithful, he had sex with another woman. Two days later[,] on September 6, 2014, the decedent discovered [Appellant]'s infidelity through text messages sent to his phone and confronted him. During the ensuing argument, the decedent broke [Appellant]'s cell phone, scratched him with a steak knife, and threw a whiskey bottle at him. After the argument, while the decedent was alone in her bedroom, she fired [Appellant]'s .25 caliber Beretta pistol into the bedroom wall. [*Id.* at 62-78.]

On September 8, 2014, [Appellant] inserted his own SIM card into the decedent's phone and used it to exchange text messages with several women throughout the day. He later travelled to the Firing Lane gun store in South Philadelphia and attempted to sell his Beretta. After the store owner told [Appellant] that he did not want to purchase the firearm, [Appellant] returned home and placed the Beretta on a computer desk in an upstairs room. [*Id.* at 95-96, 103.]

On the evening of September 8, 2014, [Appellant] and his brother, Robert Jackson Jr., were watching Monday Night Football in Jackson's home at 411 Washington Avenue, located across a small parking lot from [Appellant]'s home. At approximately 9:15 p.m., Jackson left his home to drive his wife home from work. At 9:17 p.m., [Appellant] used Jackson's phone to call the decedent, who quickly hung up on him.

Immediately after the phone call, [Appellant] walked home to 987 South 5th Street and confronted the decedent. Upon [Appellant]'s arrival, the decedent revealed that she had seen the text messages [Appellant] sent through her phone, and admonished him because he "keep[s] texting those

---

[2] Appellant testified at trial on June 24, 2016. His testimony is transcribed in the notes of testimony for that date from pages 36 to 243.

fucking girls." Despite it being past his bedtime on a school night, [Appellant] immediately ran upstairs and ordered [M.J.] to get out of bed and run to Jackson's house. After [M.J.] left, the decedent showed [Appellant] a photo she had discovered of him holding an infant he fathered with another woman. The decedent did not know the baby existed until [Appellant] inadvertently downloaded it onto her phone. [*Id.* at 103-04, 108.]

Confronted with this evidence, [Appellant] again ran upstairs, retrieved his .25 caliber Beretta pistol, and returned downstairs to the living room, gun in hand. [Appellant] then slammed the pistol on the TV stand and warned the decedent not to "talk to me like that now," acknowledging the pistol. As the argument continued, [Appellant] grabbed the pistol, pointed it at the decedent, and fired six times. [*Id.* at 188.]

As the decedent lay bleeding on the living room floor, instead of calling for medical help, [Appellant] called his brother over to 987 South 5th Street. Jackson arrived at [Appellant's] home to discover the decedent lying face up with her eyes twitching, and immediately called 911. Moments later, Police Officers Nicholas Polini, Confesor Nieves, and Martin Berkery arrived at the scene, observed the severity of the decedent's injuries, and immediately transported the decedent in a police van to Jefferson Hospital, where she expired.

As the officers investigated his home, [Appellant] fled and walked to a nearby 7-Eleven convenience store and purchased two containers of NyQuil. [Appellant] ingested the NyQuil in an alleged suicide attempt, but returned to Jackson's home the morning of September 9, 2014, where police arrested him. After his arrest, [Appellant] gave a statement to police wherein he indicated that the decedent held the gun during the argument, that he snatched it from her, and fired between four and five times.

Officer Polini recovered [Appellant]'s Beretta in the living room and discovered six live rounds in the magazine and one in the chamber. Officer Terry Tull of the Crime Scene Unit discovered six Fired Cartridge Casings ("FCCs"), four fired projectiles, and two unfired live rounds in the living room and forwarded them to the ballistics unit. Tull further

took three DNA swabs from the handgun and submitted them to the criminalistics laboratory.

Officer Robert Stott, a ballistician with the Philadelphia Firearms Unit and an expert in ballistics identification, inspected the recovered Beretta, the FCCs, and the four projectiles, observed a six right twist identification marker on each projectile, and determined that each projectile was fired from [Appellant]'s Beretta. Officer Stott further concluded that each of the FCCs were fired from [Appellant]'s firearm. At trial, Officer Stott testified that the Beretta was semi-automatic and in working condition, requiring the shooter to pull the trigger once for each round expended. A shooter would have to apply five-and-one-half pounds of force to pull the trigger of the Beretta, and the recovered firearm had a maximum capacity of nine rounds, indicating that the shooter had reloaded the weapon in the time between the incident and the weapon's recovery.

*Commonwealth v. Johnson*, No. 2432 EDA 2016, unpublished memorandum at 1-3 (Pa. Super. filed July 13, 2017) (quoting Trial Court Opinion, dated September 19, 2019, at 1-5).

At trial, M.J. testified that, on the night of the killing, he heard his parents arguing, then Appellant came into his bedroom and ordered him to go to Jackson's home, even though it was past his bedtime on a school night. N.T., 6/22/2016, at 209, 211.

According to Philadelphia Deputy Medical Examiner Dr. Albert Chu, an expert in forensic pathology, the decedent suffered six distinct gunshot wounds, including two penetrating, fatal wounds to the back of her head, two non-fatal wounds to the left forearm, a non-fatal wound to the right forearm, and a graze wound to the left shoulder. One penetrating, fatal wound to the back of the decedent's head travelled through the victim's skull and brain back to front, left to right, and slightly upward, coming to rest near the decedent's right ear. The decedent's other head wound entered the neck near the base of the skull, fractured the first cervical vertebra, and was recovered on the right side

- 4 -

of the decedent's back, near the lower neck. Dr. Chu characterized the second wound as immediately fatal, as the projectile struck the part of the spinal cord that controlled the decedent's breathing and heartbeat. Each of the decedent's wounds was consistent with shots fired while the decedent's back faced the shooter. Dr. Chu concluded, to a reasonable degree of medical certainty, that the manner of death was homicide caused by multiple gunshot wounds.

On September 10, 2014, Jackson recovered [Appellant]'s cell phone from 987 South 5th Street and surrendered it to the police. A Regional Computer Forensic Lab report of the phone revealed several threatening text messages that [Appellant] sent to the decedent in the days leading up to the homicide. Between 11:38 and 11:59 GMT on September 1, 2014, [Appellant] texted the decedent that "you pissed me off so much just now I wanted to choke you," "no, I want to leave because I don't want to be in jail for murder," and "I see how people get angry and stressed enough to kill another."

[Appellant] testified on his own behalf at trial, and claimed that on Saturday, September 6, 2014, the decedent discovered text messages between [Appellant] and other women on his phone and threatened him with a steak knife. During the argument, the decedent destroyed [Appellant]'s phone, scratched his neck, threw a whiskey bottle at him, and later fired the Beretta into the bedroom wall while he was in another room. In response, [Appellant] attempted to sell the firearm to Ashley Jefferson, Darius Coit, and the Firing Line gun store in the city, but no one was interested in purchasing it. [N.T., 6/24/2016, at 66-78, 88, 95-96.]

[Appellant] admitted on the stand that he shot the decedent multiple times after the decedent showed him the photo of him holding a child that he conceived with another woman. [Appellant] testified that after he took the phone from the decedent and attempted to delete the photo, she grabbed the gun and pointed it at him. After a "mild struggle," [Appellant] testified, he wrestled the gun away from the decedent, whereupon the gun discharged, striking and killing her. [*Id.* 71-98, 109-110. Appellant also testified that, prior to the shooting, he had entered M.J.'s bedroom and ordered M.J. to go to Jackson's house. *Id.* at 104.]

> Dr. Jonathan Arden, former Chief Medical Examiner of Washington, D.C. and an expert in forensic pathology, testified that the decedent's wounds were consistent with having been caused by five projectiles in a "rapid fire, rapid motion" situation, where the decedent faced [Appellant] when he started shooting and turned around as the bullets struck her. But Dr. Arden, during cross-examination, agreed that the wounds were consistent with the scenario presented by the Commonwealth.

Trial Court Opinion, 9/19/16, at [5]-6 (citations to notes of testimony and footnote omitted).

> The jury convicted Appellant of first-degree murder and [possessing instruments of crime ("PIC")] on June 27, 2016. That same day, the trial court sentenced Appellant to mandatory life imprisonment for first-degree murder, with no further penalty for PIC. On June 6, 2016, Appellant filed a post-sentence motion in which he alleged that his conviction was against the weight of the evidence. The trial court denied the motion on July 18, 2016. Appellant filed a timely appeal on July 25, 2016.

*Johnson*, No. 2432 EDA 2016, at 3-6. This Court affirmed Appellant's judgment of sentence. *Id.* at 1. Appellant filed a petition for allowance of appeal with the Supreme Court of Pennsylvania, which was denied on November 28, 2017.

On November 8, 2018, Appellant filed a first, *pro se*, timely PCRA petition. On January 3, 2019, the PCRA court appointed counsel to represent Appellant. The PCRA court ordered PCRA counsel to file an amended petition by April 4, 2019, and counsel complied. The amended PCRA petition raised two claims:

> Appellant is entitled to relief because trial counsel was ineffective for, (1) failing to challenge the competency of witness [M.J.] and (2) failing to object to the admission of inculpatory text messages when the Commonwealth failed to properly authenticate the texts or lay the proper foundation for their admission.

- 6 -

Amended PCRA Petition, 4/4/2019, at ¶ 14. On July 18, 2019, the PCRA court entered a notice of intent to dismiss all claims without a hearing pursuant to Pa.R.Crim.P. 907 ("Rule 907 Notice"). On July 30, 2019, Appellant *pro se* filed a response to the Rule 907 Notice, contending that PCRA counsel should have filed 11 additional claims; however, the response does not request to amend the PCRA petition. On September 20, 2019, after reviewing Appellant's response to the Rule 907 Notice, the PCRA court "determin[ed] that a *Grazier*[3] hearing was required, . . . presided over the hearing, permitted counsel to withdraw, and dismissed the instant petition." PCRA Court Opinion, dated December 12, 2019, at 2. On October 13, 2019, Appellant's newly-retained counsel filed this timely appeal.[4]

Appellant presents the following issues for our review:

I.      Did counsel violate Appellant's rights under the Sixth and Fourteenth Amendments of the U.S. Constitution and Article 1 section 9 of the Pennsylvania Constitution by ineffectively failed [*sic*] to raise a ***Brady*** claim on direct appeal after the Commonwealth failed [*sic*] to disclose witness Shavone Robinson's oral statement concerning the veracity of a statement made on Facebook[?]

II.      Did counsel violate Appellant's rights under the Sixth and Fourteenth Amendment of the U.S. Constitution and Article 1 section 9 of the Pennsylvania Constitution by ineffectively failed [*sic*] to challenge the Commonwealth's admission of eyewitness Shavone Robinson's knowingly false testimony?

---

[3] ***Commonwealth v. Grazier***, 713 A.2d 81 (Pa. 1998).

[4] Appellant filed his statement of errors complained of on appeal on November 3, 2019. The trial court entered its opinion on December 12, 2019.

III. Did counsel violate Appellant's rights under the Sixth Amendment of the U.S. Constitution and Article 1 section 9 of the Pennsylvania Constitution by ineffectively failed [*sic*] to impeach Shavone Robinson's testimony and for instead, stipulating to her statement?

IV. Did counsel violate Appellant's rights under the Sixth Amendment of the U.S. Constitution and Article 1 section 9 of the Pennsylvania Constitution by ineffectively failed [*sic*] to request a mistrial based on Shavone Robinson's false testimony?

V. Did counsel violate Appellant's rights under the Sixth Amendment of the U.S. Constitution and Article 1 section 9 of the Pennsylvania Constitution by ineffectively failed [*sic*] to adequately investigate medical and forensic evidence?

VI. Did counsel violate Appellant's rights under the Sixth Amendment of the U.S. Constitution and Article 1 section 9 of the Pennsylvania Constitution by ineffectively failed [*sic*] to mount a Confrontation Clause challenge to Dr. Chu's testimony on direct appeal?

VII. Did counsel violate Appellant's rights under the Sixth Amendment of the U.S. Constitution and Article 1 section 9 of the Pennsylvania Constitution by ineffectively failed [*sic*] to object to Dr. Chu's testimony or compel the Commonwealth to establish that Dr. Osborne was unavailable to testify?

VIII. Did counsel violate Appellant's rights under the Sixth Amendment of the U.S. Constitution and Article 1 section 9 of the Pennsylvania Constitution by ineffectively failed [*sic*] to request an order that medical expert Dr. Albert Chu prepare an independent report[?]

IX. Did counsel violate Appellant's rights under the Sixth Amendment of the U.S. Constitution and Article 1 section 9 of the Pennsylvania Constitution by ineffectively failed [*sic*] to motion to strike portions of Dr. Chu's testimony that did not appear in the medical report[?]

X. Did counsel violate Appellant's rights under the Sixth Amendment of the U.S. Constitution and Article 1 section 9 of the Pennsylvania Constitution by ineffectively failed [*sic*] to challenge on direct appeal the Court's limitation of the scope of cross-examination against witness Robert Jackson[?]

XI.     Did counsel violate Appellant's rights under the Sixth Amendment of the U.S. Constitution and Article 1 section 9 of the Pennsylvania Constitution by ineffectively failed [*sic*] to challenge this Court's failure to admit Robert Jackson's excited utterance testimony on direct appeal[?]

[XII.] Did counsel violate Appellant's rights under the Sixth Amendment of the U.S. Constitution and Article 1 section 9 of the Pennsylvania Constitution by ineffectively failed [*sic*] to challenge the admission of inculpatory text messages?

[XIII.]     Did counsel violate Appellant's rights under the Sixth Amendment of the U.S. Constitution and Article 1 section 9 of the Pennsylvania Constitution by ineffectively failing to challenge the competence of witness [M.J.]?

Appellant's Brief at 3-5 (issues reordered to facilitate disposition) (suggested answers omitted).

"We review the denial of PCRA relief to decide whether the PCRA court's factual determinations are supported by the record and are free of legal error." ***Commonwealth v. Medina***, 209 A.3d 992, 996 (Pa. Super. 2019) (quoting ***Commonwealth v. Brown***, 196 A.3d 130, 150 (Pa. 2018)), *reargument denied* (July 17, 2019).

Preliminarily, Appellant's first 11 issues on appeal are waived, because Appellant failed to include them in his PCRA petition:

Regardless of the reasons for [an a]ppellant's belated raising of [an] issue, it is indisputably waived. We have stressed that a claim not raised in a PCRA petition cannot be raised for the first time on appeal. We have reasoned that permitting a PCRA petitioner to append new claims to the appeal already on review would wrongly subvert the time limitation and serial petition restrictions of the PCRA. The proper vehicle for raising this claim is thus not the instant appeal, but rather is a subsequent PCRA petition.

*Commonwealth v. Santiago*, 855 A.2d 682, 691 (Pa. 2004) (internal brackets, citations, and quotation marks omitted); *accord Commonwealth v. Reid*, 99 A.3d 470, 494 (Pa. 2014).[5]

Additionally, Appellant's brief lacks any citations to case law or to the Rules of Evidence in support of his claim that trial counsel was ineffective for "failing to challenge the admission of inculpatory text messages," including no legal basis for how or why this evidence should have been excluded. *See*

---

[5] To the extent that we can consider the question raised in Appellant's *pro se* response to the Rule 907 Notice, to be a challenge to these issues, we would still find the issues are not preserved.

> The purpose behind a Rule 907 pre-dismissal notice is to allow a petitioner **an opportunity to seek leave to amend his petition** and correct any material defects, the ultimate goal being to permit merits review by the PCRA court of potentially arguable claims. The response is an opportunity for a petitioner and/or his counsel to object to the dismissal and alert the PCRA court of a perceived error, **permitting the court to discern the potential for amendment. The response is not itself a petition and the law still requires leave of court to submit an amended petition.** *See* Pa.R.Crim.P. 905(a).

*Commonwealth v. Rykard*, 55 A.3d 1177, 1189 (Pa. Super. 2012) (emphasis added) (some internal citations and quotation marks omitted). Consequently, in his response to the Rule 907 Notice, Appellant should have requested leave to amend his petition to add these 11 issues in order to preserve these challenges, and the PCRA court still would have had to grant permission for amendment. *See id.* Without an amended petition authorized by the PCRA court following Appellant's response to the Rule 907 Notice, his claim is still waived.

Appellant's Brief at 60-61.  Accordingly, this claim is also waived.[6]  Pa.R.A.P.

2119(a) (argument shall include citation of authorities); **Kelly v. Carman**

**Corporation**, 229 A.3d 634, 656 (Pa. Super. 2020) (citing **Commonwealth**

**v. Spotz**, 18 A.3d 244, 281 n.21 (Pa. 2011) (without a "developed, reasoned,

supported, or even intelligible argument[, t]he matter is waived for lack of

development"); **In re Estate of Whitley**, 50 A.3d 203, 209 (Pa. Super. 2012)

("The argument portion of an appellate brief must include a pertinent

discussion of the particular point raised along with discussion and citation of

pertinent authorities[; t]his Court will not consider the merits of an argument

which fails to cite relevant case or statutory authority" (internal citations and

quotation marks omitted)); **Lackner v. Glosser**, 892 A.2d 21, 29-30 (Pa.

Super. 2006) (explaining appellant's arguments must adhere to rules of

appellate procedure, and arguments which are not appropriately developed

---

[6] Assuming this claim were preserved, we would still find it meritless.  While the text messages showed that Appellant and the victim had an acrimonious relationship, this evidence was redundant of Appellant's own testimony, which demonstrated the rancor between himself and the victim.  At trial, Appellant admitted, *inter alia*, that:  the victim had discovered that he had an affair during a trip to Las Vegas, causing her to leave him temporarily; four days prior to the killing, he had sex with another woman, despite his promises of fidelity; he had been exchanging text messages with several other women on the day of the murder; the victim had discovered text messages between him and other women and a photograph of him holding his child with another woman; and he and the victim had been arguing immediately prior to the shooting.  N.T., 6/24/2016, at 41-44, 62-98, 103-04, 108-10, 152, 188. Hence, Appellant failed to establish that, if the text messages were never admitted, there would be a reasonable probability of a different trial outcome and, therefore, has failed to prove that he was prejudiced by the fact that trial counsel did not challenge the admission of the text messages.

- 11 -

are waived on appeal; arguments not appropriately developed include those where party has failed to cite any authority in support of contention)).

In his sole surviving issue, Appellant argues that his trial counsel was ineffective for failing to challenge M.J.'s competence to testify. Appellant's Brief at 58.

> [C]ounsel is presumed to be effective.
>
> To overcome this presumption, a PCRA petitioner must plead and prove that: (1) the underlying legal claim is of arguable merit; (2) counsel's action or inaction lacked any objectively reasonable basis designed to effectuate his client's interest; and (3) prejudice, to the effect that there was a reasonable probability of a different outcome if not for counsel's error.
>
> A failure to satisfy any of the three prongs of this test requires rejection of a claim of ineffective assistance.

*Medina*, 209 A.3d at 1000 (internal brackets, citations, and quotation marks omitted) (some additional formatting).

Appellant has failed to establish the third prong of the ineffectiveness test -- prejudice. *Id.* M.J.'s testimony was cumulative of Appellant's own testimony. Both M.J. and Appellant testified that Appellant and the victim had been arguing on the night of the murder and that Appellant had entered M.J.'s bedroom and told M.J. to leave for Jackson's residence. *Compare* N.T., 6/22/2016, at 209, 211, *with* N.T., 6/24/2016, at 104; *Johnson*, No. 2432 EDA 2016, at 4-5. Accordingly, assuming *arguendo* that trial counsel had challenged M.J.'s competence to testify and even if the trial court had agreed and precluded M.J.'s testimony, Appellant's own testimony would still have established the central facts that he and the victim had been arguing on the

night of the killing and that he had told M.J. to leave, from which the jury could infer Appellant was planning to murder the victim and did not want his son to be present when he shot his child's mother. The only detail added by M.J. that was not present in Appellant's own testimony was that Appellant's request for him to leave occurred after his bedtime on a school night. N.T., 6/22/2019, at 209. This detail is so minor that it is inconceivable that it had any effect on the outcome of the trial, let alone "a reasonable probability of a different outcome[.]" *Medina*, 209 A.3d at 1000. As Appellant cannot demonstrate that the outcome would have been different if M.J. had not testified, he cannot prove prejudice and, consequently, cannot establish ineffective assistance of counsel. *Id.*

For the reasons given above, we conclude that Appellant's appellate challenges are waived or meritless. Having discerned no error of law, we affirm the order below. *Id.* at 996.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/06/2020

- 13 -